ROTHENBERG, J.
(dissenting).
The record reflects that the trial court erred by: (1) repeatedly and materially restricting the ability of 50 State Security Service, Inc. (“50 State Security”) to present its defense; and (2) denying 50 State Security’s motion for a directed verdict and subsequent motion for a new trial where the plaintiff failed to prove either a breach of 50 State Security’s duty or causation. I, therefore, respectfully dissent.
Lidia Giangrandi was murdered in her home by Rafael Matarranz (“Matarranz”). Ms. Giangrandi’s home was located in the community of Loch Lomond, a special taxing district protected by security services provided by Miami-Dade County (“the County”). Ms. Giangrandi’s estate (“the estate”) brought a wrongful death action against ADT Security Services (“ADT”), the security company that provided private security services to Ms. Giangrandi, and 50 State Security, the company hired by the County to provide security services to the community of Loch Lomond. The estate settled with ADT, and proceeded to trial against 50 State Security, with ADT listed as a Fabre[6] defendant. The jury found ADT and 50 State Security equally at fault and awarded $4,780,000 in damages.
The main issues at trial were whether: (1) Matarranz was an individual who was difficult or easy to deter, which included a consideration of whether this was a victim-targeted crime or a crime of opportunity; (2) 50 State Security was negligent in the performance of its duties at Loch Lomond that night; (3) Matarranz would likely have been deterred but for 50 State Security’s negligence; and (4) 50 State Security’s negligence was the proximate cause of Ms. Giangrandi’s death. As will be discussed in this dissent, the trial court’s rulings incorrectly hampered 50 State Security’s ability to present its defense, and the estate failed to present any competent evidence that 50 State Security’s negligence was the cause-in-fact of Ms. Gian-grandi’s death.

THE TRIAL

50 State Security was hired by the County to provide security services to Loch Lomond, a special taxing district. 50 State Security has provided this service to Loch Lomond for over twenty years, and was still assigned to Loch Lomond when this case was tried eight years after the incident giving rise to the plaintiffs complaint. Pursuant to the County’s post orders, 50 State Security provided, and continues to provide, a stationary guard who monitors and records the license plate numbers of non-resident motorists who enter the community through its vehicular gate, and a roving guard who is to monitor and “continuously patrol” the community in a vehicle equipped with flashing lights. Because Loch Lomond is not a private community, all roadways leading in, through, and out of the community, are county roadways. Therefore, the guards have no authority to question, deny entrance to, or detain anyone. Additionally, 50 State Security’s officers are not permitted to enter onto any private property. Thus, the roving guard’s duties are limited to driving through the community and reporting any suspicious activity he observes from his vehicle.
Ms. Giangrandi was murdered in her home during the early morning hours of January 6, 2003, by Matarranz, who en *1138 tered through a window in a bathroom connected to Ms. Giangrandi’s bedroom. Although Ms. Giangrandi’s mother, who lived with her daughter, slept in the adjacent bedroom, she did not hear the struggle or her daughter’s calls for help. Two credit cards and some cash were taken from Ms. Giangrandi’s purse, along with a separate purse and two rings. The use of these two credit cards by Matarranz and his sister ultimately led the police to Ma-tarranz.
In addition to his use and possession of Ms. Giangrandi’s credit cards, Matarranz’s fingerprints were found at the point of entry (the sill of the bathroom window); his DNA was found on Ms. Giangrandi’s body; Ms. Giangrandi’s purse and one ring were found at the apartment where Matar-ranz had been living; and Matarranz provided a taped statement to the police admitting to the burglary and murder and to pawning one of Ms. Giangrandi’s rings. Matarranz was criminally prosecuted and convicted for these crimes.

A. Matarranz’s Statement

At the civil wrongful death trial, the estate introduced and heavily relied on Matarranz’s pre-arrest statement to law enforcement. Although this statement was introduced without objection by 50 State Security, it is important to note that the statement was taken prior to the initiation of the civil lawsuit and was not subject to cross-examination. Thus, many of the questions important to the wrongful death action were not asked by law enforcement, which led to speculation by the experts in the wrongful death action in an attempt to fill in the gaps in Matarranz’s account.
In his pre-arrest statement, Matarranz claimed that he did not know Ms. Gian-grandi and that he had never been to Loch Lomond prior to the night of the murder. Because he needed money, he rode on his bike looking for something that would provide him with money. He entered Loch Lomond through a footpath,[7] rode through Loch Lomond, and stopped at Ms. Gian-grandi’s home when he saw that one of the windows (a bathroom window on the east side of the house) was partially open. Although Matarranz saw an alarm sign in front of the house and he assumed the alarm had been activated, he concluded that because the bathroom window was partially open, the alarm would not go off if he opened the window further. Matar-ranz waited outside Ms. Giangrandi’s house from approximately 1:00 a.m. to 3:00 a.m., spending some of that time in the backyard peering through Ms. Giangran-di’s partially lit bedroom window. Matar-ranz entered the house by cutting the bathroom window screen with a piece of metal he found in the yard, raising the window, and then climbing through the opened window. While he was in Ms. Giangrandi’s bedroom, Ms. Giangrandi awakened and began to scream. Matar-ranz choked Ms. Giangrandi to silence her screams; took two credit cards and money from her purse, along with two rings, and a purse; and left the same way he had entered. Matarranz was wearing dark clothing; he was unarmed; and he knew the house was occupied, but he did not know how many people were in the house.

B. The Experts

A material contested issue at trial was whether this was a victim-targeted crime or a crime of opportunity. Based on the *1139 uncontroverted evidence, victim-targeted crimes are highly undeterrable. Both the estate and 50 State Security offered expert testimony as to whether the crime was a victim-targeted crime or a crime of opportunity; 50 State Security was negligent; and Matarranz was the type of individual who would have been deterred but for 50 State Security’s negligence. The estate presented two experts: Dwayne Tatolo-vich, a security consultant, and Dr. Michael Bayless, a forensic psychologist. 50 State Security’s expert was Greg McCrary, who is a former FBI agent and an expert on security, criminal behavior, and violent crime.
Mr. Tatolovich, the estate’s security consultant, testified that section 5.2.2 of the post orders issued by the County provides that, “Patrolling shall be done continuously except A. during use of rest rooms, B. patrol change, and C. giving aid to a stationary guard.” Mr. Tatolovich concluded that the roving guard failed to follow this post order and that these crimes would not have been committed had the post order been followed. His conclusions were based on his assumptions that: (1) “patrolling shall be done continuously” means that the roving guard is not permitted to stop his vehicle during the patrol except for one of the enumerated circumstances; (2) a roving guard travelling at five to ten miles per hour would have passed the Giangrandi home seven or eight times during the time Matarranz was there; and (3) had the roving guard properly performed his duties, either the guard would have seen Matarranz or Matarranz would have seen the guard and been deterred from committing the crimes. The evidence, however, established that Mr. Tatolovich’s first two assumptions were false and that the third assumption was pure speculation based, in part, on the first two false assumptions.
Dr. Michael Bayless, a forensic psychologist called by the estate, opined that Ma-tarranz was acting impulsively and that he was therefore deferrable. Dr. Bayless also opined that, although there was no evidence of how many times 50 State Security’s roving patrol passed the Gian-grandi house or whether Matarranz had seen the patrol, Matarranz would have been deterred from committing these crimes had 50 State Security “done [its] job properly.” The basis for Dr. Bayless’s opinion that Matarranz was impulsive and deferrable was that, in his sworn statement to the police, Matarranz claimed he selected Ms. Giangrandi’s house because a window was partially open. However, in cross-examination, Dr. Bayless admitted that Matarranz waited outside Ms. Giangrandi’s house for two hours before entering, and Matarranz was not deterred even though he knew there was someone inside the house and that the house was alarmed.
To rebut the testimony of the estate’s experts, 50 State Security called Greg McCrary, a former FBI agent, who was accepted as an expert on security, criminal behavior, and violent crime. Mr. McCrary was assigned to the Behavioral Science Unit at the National Center for the Analysis of Violent Crime for the last eight years of his twenty-five years of service with the FBI.
Mr. McCrary testified that certain classes of individuals are difficult to deter. The types of individuals who are difficult to deter include high-functioning psychopaths, and people who are not very bright. Mr. McCrary explained that people who are not very bright are less likely to consider the consequences of their acts and are more likely to take risks. Such individuals are difficult to deter, but easy to catch. Unlike the plaintiff’s security expert, who admitted that he did not review *1140 all of the evidence, Mr. McCrary testified that in determining whether Matarranz was an individual who was easy or difficult to deter, he read all of the depositions taken in the criminal case as well as the wrongful death case; read all of the transcripts from the criminal trial; reviewed seven discs of photos, ADT’s alarm records and bills, and 50 State Security’s records; visited the site of the murder; studied the layout of Loch Lomond; and took pictures of the area. He then considered Matar-ranz’s pre-offense, offense, and post-offense behavior, and he concluded that Ma-tarranz was an individual who was difficult to deter.
The pre-offense conduct Mr. McCrary relied on is as follows. In 1997, Matarranz was arrested after he was ejected from a restaurant for inappropriate behavior, and thereafter, he returned and confronted the security guard. He was told by the guard and a police officer to leave or he would be arrested. Although he left after the warning, he returned and confronted the security guard again. Mr. McCrary found it significant that Matarranz had not been deterred by either the security guard or the police officer’s presence or their warnings that he would be arrested if he returned. Matarranz was also arrested for stealing clothing from a Wal-Mart store, which Mr. McCrary found significant because Matarranz committed the crime despite the presence of security cameras, security guards, and loss prevention employees stationed throughout the store. Mr. McCrary also noted that despite the unpleasantness of his first arrest, Matarranz committed at least one other crime and then committed the instant offense.
The offense conduct relied on by Mr. McCrary was that, although most burglars do not burglarize occupied dwellings because they do not want confrontation, Ma-tarranz chose to burglarize a house he knew was occupied and alarmed. Additionally, when Mr. Matarranz entered Ms. Giangrandi’s home, he was unarmed, there were three or four cars in the driveway, and he did not know how many people were in the house or where they were located, whether they were armed, or if they had access to a panic button. These facts demonstrated that Matarranz was a risk-taker. Matarranz also demonstrated that he was a person who did not consider the consequences of his acts. He entered the house without gloves, leaving his fingerprints on the point of entry and his DNA on Ms. Giangrandi’s body; and when Ms. Giangrandi awoke and began screaming, he choked her to death rather than fleeing. Mr. McCrary noted that homicides that occur during a burglary are “extraordinarily rare” — from 2000 through 2003, there were approximately two million burglaries committed and less than one hundred involved a homicide, which computes to 5/1,000 of 1%. By escalating the crime from a property crime, with a low clearance rate of 18.4%, Matarranz substantially intensified the investigation and increased the possibility he would be apprehended by attacking Giangrandi. Lastly, even after committing murder, Matar-ranz did not immediately flee. Instead, he hesitated long enough to rifle through Ms. Giangrandi’s purse and wallet and to take other items from her bedroom.
The post-offense conduct Mr. McCrary relied on includes the fact that deterrable offenders are generally cautious, disassociate themselves from the crime, and avoid conduct that connects them to the crime. In contrast, Matarranz used the stolen credit cards, gave one of the stolen credit cards to his sister to use, and had the stolen credit cards in his possession days later when the police came to his apartment. Additionally, Matarranz pawned one of Ms. Giangrandi’s rings, still had *1141 other items belonging to Ms. Giangrandi in his apartment when the police came days later, and confessed to the burglary and murder.
Based on his review of the evidence, Mr. McCrary concluded Matarranz was very unsophisticated, highly undeterrable, and would not have been deterred by reasonable or routine security. Mr. McCrary also noted that Matarranz was not asked whether he had seen the roving security, and Mr. McCrary stated that it would be pure speculation to conclude that Matar-ranz would have been deterred if he had seen the security patrol.

THE TRIAL COURT’S EVIDENTIARY RULINGS

The experts agreed that victim-targeted crimes are very difficult to deter, but disagreed as to whether this was a victim-targeted crime and whether Matarranz was deterrable. Although the estate’s experts were permitted to testify as to all the factors they relied on in reaching their conclusions, many of which were pure assumptions and speculation, 50 States Security’s expert, Mr. McCrary, was not permitted to do the same. The trial court refused to let Mr. McCrary testify as to some of the factors he relied on in reaching his conclusions, and 50 State Security was restricted by the trial court in its cross-examination of Mr. Tatolovich, the estate’s expert, regarding his assumptions and opinions.
The excluded evidence was relevant and material to rebut Matarranz’s pre-arrest statement, which was not subject to cross-examination, and to support Mr. McCrary’s conclusion that this was a victim-targeted crime. The following evidence, relied on by Mr. McCrary in concluding that this was a victim-targeted crime, was excluded by the trial court.
(1) Matarranz rode his bike from Opa Locha to Miami Lakes, a distance of over four miles, passing numerous houses he could have burglarized. This fact would have supported and strengthened Mr. McCrary’s opinion that this was a victim-targeted crime, especially when considered with the other admitted facts that Ms. Giangrandi’s house was in a gated community protected by security; there were four cars in her driveway; Matarranz knew the house was alarmed and occupied; and Matar-ranz waited outside the house for two hours rather than selecting an unoccupied house without an alarm.
(2) A piece of paper with Ms. Giangran-di’s name written on it was found in Matarranz’s kitchen after these crimes were committed. The trial court excluded this evidence because there was no evidence as to when Matarranz wrote this note, before or after the murder. However, the inability to prove when the note was written goes to its weight not its admissibility.
(3) Ms. Giangrandi performed volunteer work involving the homeless. She also invited homeless individuals into her home and participated in prison outreach work. According to Matarranz’s sister, Matarranz was friends with a homeless man. Although the police investigation initially considered the possibility this was a victim-targeted crime, the police failed to pursue this possibility when they identified Matarranz as the murderer by his use of Ms. Giangrandi’s credit cards, his fingerprints and DNA left at the scene, and his confession to the crimes.
The trial court excluded this evidence on the basis that it was not direct evidence *1142 that Matarranz targeted Ms. Giangrandi or her house that night. This was error, as “in a civil case, a fact may be established by circumstantial evidence as effectively and as conclusively as it may be proven by direct positive evidence.” Nielsen v. City of Sarasota, 117 So.2d 731, 733 (Fla.1960). In fact, the Florida Supreme Court has specified:
Great latitude is to be allowed in the reception of indirect or circumstantial evidence.... The competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the exclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry or to assist, though remotely, to a determination probably founded in truth.
Baugher v. Boley, 63 Fla. 75, 58 So. 980, 982 (Fla.1912); see also Fenster v. Publix Supermarkets, Inc., 785 So.2d 737, 739 (Fla. 4th DCA 2001) (holding that “[a]n inference is a permissible deduction from the evidence which the jury may reject or accord such probative value as it desires ....”) (quoting Little v. Publix Supermarkets, Inc., 234 So.2d 132, 133-34 (Fla. 4th DCA 1970) (citation omitted) (alteration in original)); Lombardi v. Flaming Fountain, Inc., 327 So.2d 39, 40 (Fla. 2d DCA 1976) (“Florida courts have consistently held that circumstantial evidence is admissible generally in civil actions and, in fact, may often be more probative than direct evidence.”).
Section 90.704, Florida Statutes (2012), also specifically provides that:
The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence.
Section 90.704 and the case law applying this statute have broadened the basis of expert opinion to include information obtained from numerous sources and leave the reasonableness of the expert’s reliance on this data to be questioned on cross-examination. Bender v. State, 472 So.2d 1370, 1372 (Fla. 3d DCA 1985); see also Schwarz v. State, 695 So.2d 452, 454-55 (Fla. 4th DCA 1997) (relying on this Court’s analysis in Bender and holding that section 90.704 “is modeled after Federal Rule of Evidence 703. Under the federal statute, as well as our statute, experts may testify as to the things on which they rely.”).
Because circumstantial evidence may be relied on to establish any fact in a case and the evidence excluded in the instant case was circumstantial evidence refuting Ma-tarranz’s pre-arrest statement, which was not subject to cross-examination, and which supported and strengthened Mr. McCrary’s opinion that this was a victim-targeted crime, the trial court erred in precluding the evidence. Like all other evidence, the reasonableness of Mr. McCrary’s reliance on the excluded evidence in forming his opinion would have been subject to cross-examination.
The trial court also restricted 50 State Security’s cross-examination of Mr. Tatolo-vich, the plaintiffs security expert who rendered opinions based on assumptions, and further limited the testimony of the County’s security supervisor, Mr. Thompson. 50 State Security was not permitted to cross-examine Mr. Tatolovich on his faulty assumptions, or to rebut his testimony with the testimony of Mr. Thompson, as will be fully addressed later in this dissent. Although it was the jury’s responsibility to weigh the conflicting evidence, and this *1143 Court may not reweigh that evidence, the trial court’s rulings materially restricted 50 State Security’s ability to present relevant admissible evidence and to effectively attack the evidence offered by the estate’s experts. These rulings hampered the jury’s ability to consider and weigh the evidence.

BREACH OF DUTY AND CAUSATION

In addition to the trial court’s exclusion of the aforementioned relevant material evidence, the estate also failed to prove by competent substantial evidence that 50 State Security breached its duty or that its acts were the cause-in-fact of Ms. Gian-grandi’s death. Thus, the trial court should have directed a verdict in 50 State Security’s favor, and a reversal of the jury’s findings is mandated. To sustain a jury verdict for a cause of action sounding in negligence, a plaintiff must prove a duty owed by the defendant to the plaintiff, a breach of that duty, and that the defendant’s breach of its duty was the cause-in-fact and proximate cause of the plaintiffs damages. Curd v. Mosaic Fertilizer, LLC, 39 So.3d 1216, 1227 (Fla.2010).

A. Breach of Duty

The majority correctly notes that in reviewing a motion for a new trial based on a claim that a jury verdict was against the manifest weight of the evidence, the trial court must determine whether the verdict is supported by competent substantial evidence. Brown v. Estate of Stuckey, 749 So.2d 490, 496 (Fla.1999). It is also axiomatic that this Court must review the trial court’s order Ending that the verdict was supported by competent substantial evidence under the abuse of discretion standard and that this Court may not re-weigh the evidence in making that determination. However, where, as here the estate has failed to prove by competent substantial evidence that 50 States Security breached its duty to Ms. Giangrandi, and that her death was caused by 50 State Security’s negligence, the verdict cannot stand.
Pursuant to its contract, 50 State Security was to provide security services to the residential community at Loch Lomond twenty-four hours a day, seven days a week. The contract specified that 50 State Security would provide a stationary guard at the guardhouse and one roving guard in a patrol vehicle. The roving guard and the stationary guard rotated every two hours. In addition to these contractual obligations, the County issued “post orders” specifying that the roving guard was to provide “continuous patrolling” of the Loch Lomond community. Totally separate from 50 State Security’s obligations to the County and the residents of Loch Lo-mond, 50 State Security installed four “Deggy points” in Loch Lomond to enable it to monitor the activities of its roving guard. When a Deggy point is touched with an electronic device by a roving guard, the device registers the contact and downloads the information for subsequent review by 50 State Security. All of the witnesses, including the estate’s experts, testified that Loch Lomond’s contract and the post orders issued by the County did not require the roving guard to touch any of the Deggy points while patrolling, and that the Deggy points were installed by 50 State Security for its own internal purposes.
The uncontested evidence is as follows. On the night of Ms. Giangrandi’s murder, there were two guards on duty, a stationary guard and a roving guard, and the roving guard and the stationary guard alternated every two hours as required by the County’s post orders. The posts logged that night show that Officer Macbeth, who was on duty and serving as the roving guard, finished his two-hour shift *1144 and returned to the guardhouse at the front entrance at midnight. Lieutenant Leary, who came on duty at midnight, then began his shift as the roving guard. Officer Macbeth remained on duty at the guardhouse until he was relieved by Lieutenant Narine at 1:20 a.m. At 12:30 a.m., the guards on duty reported that everything was okay, which is reflected on the log as “QRU,” and made similar entries at 1:00 a.m. (“Post is secure”), 1:09 a.m. (“Post check QRU”), 2:30 a.m. (“All appears QRU”); 3:00 a.m. (“All appears QRU”); 3:30 a.m. (“All appears QRU”), 4:00 a.m. (“All appears QRU”); 5:00 a.m. (“All appears QRU”), etc.
In addition to these posts, the record reflects that the Deggy points were activated during the relevant time periods at: Glenn Eagle, which is the point closest to Ms. Giangrandi’s house, at 12:43:49 a.m.; Torfin at 12:48:22 a.m.; the guardhouse at 1:11:15 a.m., 1:34:04 a.m., and 1:35:05 a.m.; Prestwick at 1:42 a.m.; Torfin at 1:47 a.m.; Glenn Eagle at 2:25 a.m.; Torfin at 2:29 a.m.; and the guardhouse at 4:19 a.m. Matarranz testified he was at Ms. Gian-grandi’s house from 1:00 a.m. to 3:00 a.m. Thus, the uncontroverted evidence reflects that during the relevant time frame, 1:00 a.m. to 3:00 a.m., the roving guard was roving and the stationary guard was also performing his duties. Also, in addition to the two guards on duty, the log reflects that a supervisor appeared at 1:09 a.m. to conduct an inspection, which Mr. Barcinas, the vice-president of 50 State Security, explained, included an inspection of each of the posts to confirm that everything was secure.
Despite this uncontroverted evidence, the estate’s expert opined that 50 State Security’s guards breached their duty to Ms. Giangrandi by not following the post orders, and but for their negligence, Ms. Giangrandi would not have been murdered. The estate’s expert based these opinions on false assumptions and speculation unsupported by any record evidence. These assumptions were as follows.
Assumption # 1: Continuously patrolling means the vehicle must be continuously moving. This assumption, however, was not only not supported by any record evidence, it was in fact proven to be a false assumption. Donald Thompson, the security supervisor for the Miami-Dade County Public Works Department, Special Taxing District Division for twenty-three years prior to the trial, testified that his department hired 50 State Security to service Loch Lomond; 50 State Security has serviced Loch Lomond since the 1990s; his department supervises and randomly inspects the operation several times a week; and he is the person who drafted the post orders issued to 50' State Security. Mr. Thompson testified that if a roving guard stops moving but he is still patrolling the area, he is in compliance with the post orders.[8] Paul Barcinas, 50 State Security’s vice-president, also testified that “continuously patrolling” does not mean the officer must be continuously moving. He explained, as did Mr. Thompson, the author of the post orders, that the roving officer may remain stationary in an area or zone for random periods of time and still be classified as “continuously patrolling.” As both he and Mr. Thompson noted, it is important that the patrol be random and unpredictable. Thus, Mr. Tatolovich’s assumption that the roving guard must be continuously moving in order to comply with post order 5.2.2, which he failed to support with any evidence, was false.
*1145 Assumption #2: The estate’s expert testified that he measured the time it would take to drive through Loch Lomond and that if the roving guard had properly performed his duties, he would have passed Ms. Giangrandi’s home seven to eight times in the two hours Matarranz was at her house. However, the estate’s expert’s conclusion was based on two false assumptions: that the roving patrol would have a constant traveling speed of five to ten miles per hour without stopping, and that the patrol would not be random and unpredictable. However, the uncontested evidence illustrated that 50 State Security’s guards do not travel at that speed, they often randomly stop to monitor an area, and they spend unequal time in each neighborhood, as is permitted by the County’s post orders.
Anthony Leary, a supervisor for 50 State Security whose responsibility is to perform inspections and make sure the guards are properly performing their duties, was one of the guards on duty the night Ms. Giangrandi was murdered. When asked how fast the roving guards drive, he testified they drive “at idle” with a foot on the brake to allow the driver to observe the houses. He further explained that to keep the patrol random, although the guard is “mostly rolling,” sometimes he stops and sits while patrolling for a few minutes (which he explained was not more than five to ten minutes); he will observe some houses more than others in a round; and during a two-hour period he would see all of the houses at least twice, but sometimes more. Paul Barcinas, the vice-president of 50 State Security also testified that there is no requirement that the roving guard be continually moving and that it is entirely permissible for the roving guard to remain at a particular location or within a particular zone for a period of time. Thus, Mr. Tatolovich’s assumption as to how many times a roving guard should pass a given house in a two-hour period if properly performing his duties was premised on his false assumptions regarding 50 State Security’s contractual obligations and the roving guard’s speed of travel.
Assumption # 3: Had the roving guard properly performed his duties, he either would have seen Matarranz or Matarranz would have seen the guard, and Matarranz then would have been deterred from committing the crimes. This assumption was based on the previously discussed unsupported assumptions that “continuously patrolling” means continuously moving; the roving guards drive their vehicles at a speed of five to ten miles per hour; and if the roving guard had been continuously moving at that speed, he would have passed each house seven or eight times during a two-hour shift. It was also based on pure speculation: that had the roving guard passed by Ms. Giangrandi’s house seven or eight times during that two-hour period, Matarranz would have been seen by or Matarranz would have seen the roving guard and he would have been deterred.
First, there was no evidence presented as to how many times the roving guard actually passed by Ms. Giangrandi’s house during the relevant time period or how long the guard was in a position to observe the house. We know the roving guard was in the general vicinity of Ms. Giangrandi’s house at 12:43 a.m., 1:51 a.m., and 2:25 a.m. because the Deggy point at Glenn Eagle was activated at those times. We know that the roving guard activated the Deggy point at Glenn Eagle at 12:43 a.m., the Deggy point at Torfin at 12:48 a.m., and the guardhouse at 1:11 a.m. We also know that the roving guard continued his rounds during the time Matarranz was outside Ms. Giangrandi’s house from 1:00 a.m. to 3:00 a.m. because the Deggy points were activated again at the guardhouse at *1146 1:34 a.m., Prestwick at 1:42 a.m., Torfin at 1:47 a.m., Glenn Eagle at 1:51a.m., the guardhouse at 2:14 a.m., Glenn Eagle at 2:25 a.m., Torfin at 2:29 a.m., and the roving guard returned to the guardhouse for the 4:00 a.m. shift change. What we do not know is how long the roving guard stayed in the Glenn Eagle neighborhood, how many times he actually passed Ms. Giangrandi’s house while in her neighborhood, or whether he stopped to observe her particular street for a period of time and if so, for how long, because no evidence was presented as to those issues. However, we do know that although the roving guard was in the vicinity of the Giangrandi house at least three times while Matarranz was in the vicinity of the Giangrandi house, Matarranz was not deterred. We also know, based on his prior criminal history, that the presence of security guards, police officers, loss prevention employees, and security cameras, did not deter Matarranz. In fact, after being ejected from a restaurant by a security guard and after a police officer specifically warned Matarranz to leave or he would be arrested, Matarranz was not deterred. And we also know he selected the Gian-grandi home to burglarize despite the fact there were three or four cars in the driveway, he knew there were people in the house, and he knew the house had an alarm which he surmised was activated.
Second, because Matarranz was not deposed and he did not testify at the wrongful death trial, he also did not provide any evidence as to how many times the roving guard drove past the Giangrandi house while he was there or whether he had seen the roving guard during any of guard’s surveillance of the Glenn Eagle neighborhood. We do know from Matarranz’s pre-arrest testimony, however, that he was behind the house for a period of time. We also know from Mr. McCrary’s testimony that the bathroom window was located on the side of the house near the back of the house; that side of house was narrow, bordered by a tall hedge, unlit and dark; and the view of the window from the street was obstructed by a “wing wall” and a large tree.
Third, because there was no evidence as to whether Matarranz was even in a position to see the guard or for the guard to see him regardless of how many times the guard drove past the Giangrandi house, it was pure speculation to opine that had the number of drive-bys 50 State Security conducted been greater, these crimes would not have been committed. See All Am. Pool Surface, Inc. v. Jordan, 870 So.2d 885, 886 (Fla. 3d DCA 2004) (reversing for a new trial where “the expert’s testimony was based on speculation, conjecture, and incorrect assumptions .... ”).
The majority has failed to identify any competent evidence that 50 State Security breached its duty by failing to follow the County’s post orders, as was alleged. The security supervisor for the County, who wrote the post orders for 50 State Security, explained that “continuously patrolling” does not mean “continuously moving”; it was undisputed that 50 State Security had two guards on duty at Loch Lomond that entire night: a stationary guard who remained at the gate and a roving guard who patrolled the Loch Lo-mond community in a patrol vehicle; and the activated Deggy points, logs, and testimony of the security guards demonstrate the roving guard was roving during the relevant periods.
Although the majority contends there was testimony that there was “a breakdown in patrolling” that night, the record does not support this claim. As stated earlier, there is no record evidence as to how many times the roving guard passed Ms. Giangrandi’s home; how much time he *1147 spent in the Glen Eagle neighborhood, or in the vicinity of Ms. Giangrandi’s home, or whether the roving guard stopped moving at any point, and if so, for how long. Thus, the estate failed to offer any proof that 50 State Security breached its duty by failing to follow the County’s post orders.
The majority, as did the estate, conflates 50 State’s Security’s contractual duty to follow the County’s post orders, with 50 State Security’s own internal monitoring system. There is, however, nothing in 50 State Security’s contract with the County or in the post orders issued by the County that requires 50 State Security’s roving guards to make contact with the Deggy points when they pass by them, and Mr. Leary testified that the roving guards do not always make contact with the Deggy points. Despite the questionable relevance of the Deggy point evidence, the record reflects that the Glen Eagle Deggy point was activated while Matarranz was in the vicinity of the Giangrandi home and, despite the visibility of the roving guard, Matarranz was undeterred.
In its attempt to find some record evidence to prove 50 State Security breached its duty, the majority cites to 50 State Security’s vice-president Paul Barcinas’s testimony. However, a careful review of Mr. Barcinas’s testimony reveals that the majority’s reliance on his testimony to prove negligence or causation is misplaced. First, Paul Barcinas never testified that the failure to activate the Deggy points between 2:29 a.m. and 4:19 a.m. was a breakdown in security. Rather, he testified that the failure to activate the Deggy points during that time period was not in compliance with 50 State Security’s own procedural monitoring system.
Q: What happened after 2:29 in the morning?
A: The next touch was at 4:19 and 12 seconds.
Q: That’s more than an hour and a half?
A: That is correct.
Q: That’s not in compliance with your expectations, is it?
A: No.
Second, the only relevant time period is between shortly before 1:00 a.m., as Ma-tarranz made his way from the pedestrian unmaned entrance to Ms. Giangrandi’s house, and 3:00 a.m., when Matarranz was waiting outside the house and he potentially could have been deterred. By his own testimony, Matarranz entered the house at 3:00 a.m. and committed the murder shortly thereafter in a bedroom facing the back of the house, which was not visible from the street. Thus, whether the roving guard passed by the Giangrandi house or was actively patrolling between 3:00 a.m. until 4:19 a.m. is irrelevant, as the crime had already been committed.
Third, although Mr. Barcinas did testify, as the majority contends, that “the roving guard was expected to keep moving and would be allowed to stop moving only ‘if the officer is filling out an accident report,’ or ‘if he overheard or had seen something that might arouse his suspicions,”’ Mr. Barcinas clarified his statement by explaining that continuously patrolling does not mean continuously moving from one zone to another zone. He stated that the most important function of the roving guard is to be visible and that it is entirely permissible for the roving guard to remain at a particular location or within a particular zone for a period of time to merely observe. He also testified there was no evidence that the roving guard ever stopped during his rounds or failed to continuously patrol the night Ms. Gian-grandi was murdered.
Lastly, the majority both misstates the record and relies on the estate’s expert’s *1148 pure speculation in its attempt to find some record support for its affirmance of the jury’s verdict. The majority incorrectly states that the estate’s expert testified that the roving guard “spent thirty minutes of the two crucial hours parked at the guardhouse in the company of the other guard, rather than patrolling the streets.” The testimony by the estate’s expert, however, was that the roving guard spent twenty-four minutes, not thirty minutes at the guardhouse, and like all of the estate’s expert’s opinions and statements, this statement was rank speculation, not competent evidence. The record reflects that the roving guard activated the Deggy point at the guardhouse at 1:11:15 a.m., 1:11:18 a.m., 1:34:04 a.m., and 1:35:04 a.m. The estate’s expert, without any supporting evidence, concludes that these entries establish that the roving guard “sat” at the guardhouse from 1:11:15 a.m. until 1:35:04 a.m. However, an equally reasonable explanation of these entries is that the roving guard activated the guardhouse Deggy point at 1:11:15 a.m. when he arrived at the guardhouse, he immediately hit the Deggy point again at 1:11:18 as he left the guardhouse, he returned to the guardhouse after patrolling the area at 1:34:04 a.m., and he left the guardhouse one minute later at 1:35:04 a.m. This statement by the estate’s expert was not only pure speculation, it was contrary to the direct evidence presented. Anthony Leary, the roving guard who was on duty at that time testified that for the most part he was “continuously rolling,” but at times he would stop for a few minutes and observe for no more than five to ten minutes.
In conclusion, the estate’s attempt to establish a breach of duty and causation was premised entirely on the number of times 50 State Security’s roving guard should have passed the Giangrandi house during a two-hour time frame, which the estate’s expert opined was seven or eight times. To arrive at this number, the estate’s expert relied on several false assumptions including a constant five to ten miles per hour speed of travel; the County’s post orders required the roving guard to continuously move; the roving guard would simply drive from one neighborhood to the next without circling or doubling back through any of the neighborhoods; and the guard would spend equal time at each location. However, the unrefuted evidence was that the roving guard drove with his foot on the brake, not at five to ten miles per hour; he was not required to be continuously moving, and in order to be unpredictable and random, as the contract required, he would stop and survey an area for short periods of time (which he testified was not more than five or ten minutes); he would not follow a particular pattern; and he would drive through some neighborhoods more times than other neighborhoods during a shift.
In addition to failing to prove by competent evidence how many times the roving guard should have passed the Giangrandi house from 1:00 a.m. to 3:00 a.m., the estate failed to prove how many times 50 State Security’s roving guard actually did drive past the house during that time frame, or how long the guard spent in a location where he could see, or be seen by, Matarranz. Further, the estate’s attempt to prove 50 State Security’s breach by evidencing how many times, and when, the roving guard activated the Deggy points is undercut by the clear fact that there was no contractual duty to make contact with these Deggy points and the County’s post orders made no such demand. Thus, the estate failed to establish that 50 State Security breached its duty to Ms. Gian-grandi.

B. Causation

In addition to failing to prove a breach of duty, the estate also failed to prove Ms. *1149 Giangrandi’s death was caused by 50 State Security’s negligence. Causation consists of two distinct subelements: (1) the cause in fact, and (2) proximate cause. Schuette v. State, 822 So.2d 1275, 1281-82 (Fla.2002). In the criminal context, the Florida Supreme Court in Schuette stated the following:
In order to establish that a defendant’s conduct was the “cause in fact” of a particular harm, the State usually must demonstrate that “but for” the defendant’s conduct, the harm would not have occurred....
In addition to establishing “cause-in-fact” causation, the State must also demonstrate that the defendant’s conduct was the “proximate cause” of the particular harm. Florida courts have considered two basic questions in determining proximate cause: (1) whether the prohibited result of the defendant’s conduct is beyond the scope of any fair assessment of the danger created by the defendant’s conduct and (2) whether it would be otherwise unjust, based on fairness and policy considerations, to hold the defendant criminally responsible for the prohibited result.
Id. (quoting Eversley v. State, 748 So.2d 963, 966-67 (Fla.1999)) (emphasis added).
The same legal principles apply to tort law. “[Tjhere can be no liability for any tort unless it be shown that the defendant’s act or omission was a cause-in-fact of the plaintiffs claimed injuries.” Stahl v. Metro. Dade County, 438 So.2d 14, 17 (Fla. 3d DCA 1983) (emphasis added). While causation-in-fact requires proof that “but for” the defendant’s negligence, the harm would not have occurred, the proximate cause element of a negligence action is concerned with whether and to what extent a defendant’s conduct foreseeably and substantially caused the plaintiffs injury. Byers v. Ritz, 890 So.2d 343, 347-48 (Fla. 3d DCA 2004) (en banc); see also Davis v. Bruhaspati, 917 So.2d 350, 351-52 (Fla. 1st DCA 2005) (noting the distinction between cause-in-fact and proximate cause and reiterating that proximate cause focuses on foreseeability).
The estate claimed 50 State Security was negligent in the performance of its security duties and as a result, Ms. Gian-grandi was murdered. Thus, the estate’s argument was that “but for” the failure of 50 State Security’s roving guard to pass by Ms. Giangrandi’s house seven or eight times in the two-hour time period in which Matarranz waited outside the Giangrandi’s house, Matarranz would not have burglarized the house and murdered Ms. Gian-grandi. However, the estate failed to establish how many times the roving guard actually did drive past the house or for how long he remained in the general area of Ms. Giangrandi’s house, or whether Ma-tarranz saw or was aware of the roving guard. It was, therefore, pure speculation to opine that, had 50 State Security properly performed its duties, Matarranz would have been deterred, and thus cause-in-fact was not proven.
Causation cannot be based on the stacking of inferences or assumptions, and the mere possibility of causation is insufficient to establish liability. Stanley v. Marceaux, 991 So.2d 938, 939-40 (Fla. 4th DCA 2008).
A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.
Greene v. Flewelling, 366 So.2d 777, 781 (Fla. 2d DCA 1978) (quoting William Prosser, The Law of Torts, 241 (4th ed. 1971)). There must be such a natural, direct and continuous sequence between the negligent *1150 act and the injury that it can reasonably be said that but for the act the injury would not have occurred. Cassel v. Price, 396 So.2d 258, 266 (Fla. 1st DCA 1981). Because there was no evidence as to how many times 50 State Security’s roving guard drove past the Giangrandi house during the relevant time period, how long the guard was in a position to see or be seen at that location, whether Matarranz had seen the guard, how many times Ma-tarranz saw the guard, or what precautions Matarranz may have taken to avoid detection, the possibility that but for the frequency of the guard’s drive-bys these crimes would not have been committed remains pure speculation and conjecture.
Lastly, although the estate failed to prove that 50 State Security breached its duty, proof of a breach of duty does not necessarily establish that the breach was the cause-in-fact of the injury. For example, in Brown v. Motel 6 Operating, L.P., 989 So.2d 658 (Fla. 4th DCA 2008), a case recognized by the majority, Mr. Brown was shot to death in his motel room and his estate filed a wrongful death action against Motel 6 alleging it was negligent by failing to take greater security precautions. The trial court ultimately granted summary judgment in favor of Motel 6 and the Fourth District affirmed, concluding that although the jury could find that Motel 6 had breached its duty by failing to provide greater security, the estate failed to demonstrate that Mr. Brown’s death resulted from the breach of duty. Id. at 658-59.
The only evidence the majority cites as evidence of causation is: (1) “the murderer waited outside and finally broke into the home during the time period when the roving guard should have been patrolling, but was not”; and (2) “this particular type of opportunistic crime would have been detected or deterred if the guard had been properly patrolling.” The majority also contends that “[t]his evidence places this case within the ambit of Williams[9] and Holley[10]. Respectfully, the majority mis-characterizes the evidence, and Williams and Holley highlight the lack of evidence in the instant ease.
The window Matarranz “broke into,” was an unalarmed partially open window located on the side of and at the back of Ms. Giangrandi’s home. The undisputed evidence established that there was a tall hedge along that side of the house, which was described as an “alleyway”; this side of the house was unlit and dark; there was a “wing wall” and a large tree obstructing the view from the street; and 50 State Security was not permitted to enter onto any of the homeowner’s property or to walk around any of the homes. As to whether the guard was patrolling outside the home from 1:00 a.m. until 3:00 a.m. while Matarranz was waiting outside Ms. Giangrandi’s home, the evidence reflects that the Deggy point near Ms. Giangran-di’s home was activated at least twice during that time, which demonstrates that the roving guard was in fact patrolling the area of Ms. Giangrandi’s home between 1:00 a.m. and 3:00 a.m.
The cases the majority relies on highlight the lack of evidence in the instant case. In Williams, this Court reversed the directed verdict entered in favor of the defendant, Office of Security & Intelligence, Inc. (“OSI”), because there was sufficient evidence to support a finding that OSI was negligent and that its negligence was the proximate cause of the rape of Ms. Williams, a tenant of the apartment complex OSI was hired to protect. Williams, *1151 509 So.2d at 1283-84. The evidence established that OSI was hired to patrol the apartment complex twenty-four hours a day. However, instead, of patrolling, the guards “slept, watched television, stayed in their apartments, socialized with their girlfriends, and left the premises.... [T]hey also failed to prepare written incident reports or notify the police of the series of rapes occurring at [the complex].” Id. at 1283.
In Holley, the victim was raped and murdered in her apartment by an intruder. The victim’s estate sued the landlord based on the landlord’s failure to provide reasonable security measures for the common areas of this twelve-building, sprawling, low-income complex, which had been plagued by a high incidence of serious crime and violence. In the year preceding the murder, twenty “class one” violent crimes were reported to the police, six of these reports involved violent assaults, and seven apartments in the complex had been burglarized. Holley, 382 So.2d at 99. Although the landlord had previously provided uniformed armed guards to patrol the complex, the guard service was terminated during the year of this homicide. This Court therefore concluded that due to the high incidence of prior violent crime, it was reasonably foreseeable that future violent crime would be committed at the premises, and thus, a jury could conclude that the landlord breached its duty by discharging the guard or by failing to provide other security to the premises. This Court reversed the summary judgment entered in favor of the landlord because the plaintiff offered sufficient evidence to create a jury question as to whether and to what extent the landlord’s conduct foreseeably and substantially caused the victim’s rape and death. Id. at 102.
These cases stand in sharp contrast to the instant case. In the instant case, the estate offered no evidence that the roving security guard was not performing his duties or that there had been any prior reports of burglaries or other crimes committed at Loch Lomond. Because the estate did not offer any evidence as to how many times the roving guard passed by the Giangrandi home between 1:00 a.m. and 3:00 a.m., or whether Mattaranz was able to see the roving guard from where he was located (we know he was in the backyard for much of the time looking in Ms. Giangrandi’s bedroom window which faced the backyard and a golf course running behind the house), it was pure speculation to opine that if the roving guard had passed by the Giangrandi home more than the unknown number of times he did, Ma-tarranz would not have murdered Ms. Giangrandi. Further, there was no established history of crime in the area. Consequently, the estate did not prove causation.

CONCLUSION

The trial court erred by materially restricting 50 State Security’s ability to present relevant admissible evidence; the record in this ease is devoid of competent substantial evidence establishing that 50 State Security breached its duty; and the estate failed to prove that but for the negligence of its guards Matarranz would not have murdered Ms. Giangrandi. Thus, the trial court abused its discretion in denying 50 State Security’s motions for a directed verdict and for a new trial. See Fulton Cnty. Adm’r v. Sullivan, 753 So.2d 549, 554 (Fla.1999).[11]
Accordingly, I respectfully dissent.

. Fabre v. Marin, 623 So.2d 1182 (Fla.1993).

. The footpath is not gated or guarded and permits access for non-vehicular travel into the community.

. Q: If a roving guard stops moving but is still providing patrol, is that within the post orders?
A: Yes.
T.936

. Williams v. Office of Sec. & Intelligence, Inc., 509 So.2d 1282 (Fla. 3d DCA 1987).

. Holley v. Mt. Zion Apartments, Inc., 382 So.2d 98 (Fla. 3d DCA 1980).

. In Fulton, the Florida Supreme Court held:
*1152 It is correct that technically, in addition to the motion for new trial, respondent should have filed a motion renewing his earlier motion for directed verdict in compliance with Florida Rule of Civil Procedure 1.480. However, when a motion for new trial encompasses the same legal basis upon which a motion for directed verdict was made during the trial and at the close of all of the evidence, our courts should look to the substance of the motion and rule on the basis of the legal issue raised in the motion. Therefore, we reject petitioner’s claim that the district court, after reversing the final judgment, was powerless to direct the entry of judgment in respondent’s favor.
Fulton, 753 So.2d at 554.